IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| KAREN DUNN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 98-AR-1339-M |
| ) | |
| THE UNIVERSITY OF ALABAMA ) | ENTERED |
| IN BIRMINGHAM, RALPH ) | |
| HENDRIX, and TERRY WILLIAMS, ) | MAR 19 2002 |
| ) | |
| Defendants. ) | |

## MEMORANDUM OF OPINION

The plaintiff, a black female, asserts employment discrimination and retaliation claims. She began working for the defendant, the University of Alabama in Birmingham, in 1992, as a Case Manager/Counselor for Treatment Alternative for Street Crimes (TASC). Ralph Hendrix, a white male, was the plaintiff's immediate supervisor until November, 1996, when Terry Williams, a white female, became the plaintiff's immediate supervisor. The plaintiff's job required her to work very closely with state probation officers and various Jefferson County Circuit Court officials. As a result of various problems with certain probation officers and her supervisors, the plaintiff submitted her resignation on July 8, 1997, to become effective August 8, 1997. The plaintiff applied for a job at TRI. After TRI called Williams to inquire about the plaintiff's job performance while at TASC, TRI decided not to hire the plaintiff. The plaintiff does not seek

reinstatement to her old job or any other position with the defendant.

In Count 1 of her complaint, the plaintiff claims Title VII race discrimination against UAB; in Count 2, sex discrimination, hostile environment, and sexual harassment against UAB; in Count 3, Title VII retaliation against UAB; in Count 4, Section 1983 race discrimination against Hendrix; and in Count 5, a Section 1983 retaliation claim against Williams. The defendants have filed a motion for summary judgment as to all claims, and a motion to strike certain of the plaintiff's summary judgment evidence.

The defendants filed an excellent brief in support of their motion for summary judgment fully setting out the relevant facts and in a light most favorable to the plaintiff. In response, the plaintiff filed a memorandum of law, stating that the motion for summary judgment is due to be denied for the reasons set forth in her memorandum. The defendants filed a reply to the plaintiff's response.

From an organizational standpoint, the plaintiff's claims are somewhat unclear. The counts in the complaint, the designation of claims in the "Facts" section of the plaintiff's memorandum, and the designation of claims in the "Argument" section of the memorandum, are not entirely consistent. Nevertheless, all of the plaintiff's supposed claims, wherever stated, will be addressed. All of the facts in the following discussions come from the summary judgment evidence submitted by the parties as pointed out in their briefs.

## General Discrimination Law

The case of *McDonnell-Douglas Corp. v Green*, 93 S.Ct. 1817 (Sup. Ct. 1973) set out the now-familiar basic framework for Title VII cases of discrimination. The plaintiff must make a prima facie case of discrimination by showing that he is a member of a protected group, he suffered an adverse action by the employer, and evidence of discrimination. If the plaintiff establishes a prima facie case of discrimination, the employer must give legitimate, non-discriminatory reasons for having taken the actions complained of. If the employer sets out legitimate, non-discriminatory reasons for its actions, the plaintiff must point to evidence indicating that the employer's reasons are mere pretexts for discrimination. This general statement of adverse action discrimination law is sufficient for the facts of this case.

With respect to workplace environment --- harassment is a form of discrimination --- the Eleventh Circuit stated that an employer violates Title VII "by creating or condoning an environment at the work place which significantly and adversely affects an employee because of his race or ethnicity, regardless of any other tangible job detriment to the protected employee." *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1982). In *Vance v. South Central Bell*, 863 F.2d 1503 (11th Cir.1989), the court, following its decision in *Henson*, explained that not all workplace conduct that may be described as harassment affects a "term, condition or privilege" of employment within the meaning of Title VII. *Id.* at 1510. The harassment

> must be sufficiently pervasive so as to alter the conditions of employment or create an abusive working environment. Whether sexual harassment at the work place is sufficiently severe and persistent to affect seriously the psychological well-being of employees is a question to be determined with regard to the totality of the circumstances.

*Id.* at 1510, *quoting Henson*, 682 F.2d at 904.

### Probation Officer Linda Page-O'Bryant

Linda O'Bryant was a state probation officer who worked with the plaintiff. Their main contact was in a state courtroom. At the end of 1996, the plaintiff began having problems with O'Bryant. When the plaintiff and O'Bryant disagreed concerning the type of drug treatment one of the plaintiff's clients needed, O'Bryant went to and got the state judge to enter the orders she wanted. When addressing the plaintiff, O'Bryant was disrespectful in tone and comment. On occasion, O'Bryant yelled at the plaintiff, criticizing the performance of certain aspects of her job.[1] The plaintiff reported O'Bryant's behavior to Hendrix, who told the plaintiff it would "be all right" and "maybe Linda just had problems with black females." *Plaintiff's Deposition*, p. 119-20. The plaintiff admits in her deposition that O'Bryant never made a racist remark to her. The plaintiff testified, "I felt she was being disrespectful to me because I am black. That's what I felt." *Id.* at 124.

Hendrix's speculation that O'Bryant might have a problem with black females

---

[1] O'Bryant also yelled at the clients.

would not be admissible at trial. In any event, the evidence clearly is insufficient to support a finding that O'Bryant's conduct constituted race discrimination or any other violation of Title VII. If O'Bryant cannot be found to have racially harassed or discriminated against the plaintiff, it follows that Hendrix cannot be faulted for not having taking action --- what he could have done is not stated by the plaintiff --- concerning O'Bryant's behavior.

### Probation Officer David Stutts[2]

The plaintiff claims that she was sexually harassed by David Stutts, another probation officer, from 1994-97. She had contact with Stutts in Judge Pearson's courtroom every other Friday until 1997, when Stutts worked in the courtroom every Friday. The plaintiff states that Dunn touched her leg once when she had a run in her stocking, watched her, sat too close to her, stood too close to her, commented on her losing weight and looking good, attempted, without success, to hug her, called her "baby," and told "little jokes" that the plaintiff cannot recall. The plaintiff told Stutts, one time, "I don't want this to happen; that [you] need to stop." *Dunn Deposition*, pp. 156-57. The plaintiff states that she spoke to Hendrix about Stutts more than four times, but Hendrix

---

[2] The plaintiff's intention as to this claim is unclear. In footnote one in her memorandum, she states that she "is filing a notice of dismissal as to [her] claim of sexual harassment under Count 2 of her complaint." The plaintiff, however, discusses Stutts' alleged sexual harassment in her memorandum, and she has not filed a dismissal or moved for dismissal. Therefore, the court will discuss this claim.

did not do anything to remedy the situation. Hendrix told her that she would not be in Judge Pearson's courtroom much longer because of the rotation of courtrooms; apparently, however, the plaintiff remained in Pearson's courtroom. Hendrix testified that he did not think the plaintiff was making a complaint against Stutts, because his conversation with the plaintiff concerning Stutts mainly concerned her dislike of Stutts' actions as a probation officer.

The defendants assert that the plaintiff is precluded from raising this claim because she failed to include it in her EEOC claim, which is a prerequisite to raising Title VII claims in court. *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985). At the end of her EEOC charge, the plaintiff states that she had "been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, because of her race, sex, and retaliation." Although the plaintiff mentioned the word "sex" in that conclusive statement, she did not mention Stutts or even use the word "sex" in her EEOC statement of the facts.

The defendants additionally argue that the sexual harassment claim fails on the merits as a matter of law. The court agrees with the argument set out in the defendants' brief:

> In order to violate the law, sexual harassment must be severe or pervasive enough to create an abusive, hostile or intimidating working environment. *Meritor*, 477 U.S. at 67. This may consist of "discriminatory intimidation, ridicule, and insult...sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id. See also Henson v.*

*City of Dundee*, 682 F.2d 897 (11th Cir. 1982). Also, the conduct must create an atmosphere which is both objectively and subjectively hostile or abusive; that is, it must be such that a reasonable person would find it hostile or abusive, and it must also be one that the victim "subjectively perceives" as abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 370 126 L.Ed. 2d 295 (1993). Further, a plaintiff must establish among other things that the harassment occurred because of the individual's sex, and that the "harassment was sufficiently severe or pervasive to affect a term, condition or privilege of employment." *Huddleston v. Roger Dean Chevrolet*, 845 F.2d 900, 904 (11th Cir. 1993).

It is worthwhile to note that the EEOC has promulgated policy guidance on sexual harassment, which provides that the agency looks to the following six factors to determine whether a particular environment is hostile:

1. Whether the conduct is physical or verbal;
2. Frequency of the conduct;
3. Whether the conduct is hostile or relatively innocuous;
4. Whether the harasser is in a position of authority over the alleged victim;
5. Whether the behavior was engaged in by one or more persons; and
6. Whether the behavior was directed at one or more persons.

*EEOC Policy Guidance on Sexual Harassment*, N:4044. Applying these factors, the conduct alleged in this case clearly does not create a legally hostile environment. First, all of the conduct alleged is verbal, and the language itself is not in the least profane or vulgar. Even taking the facts in the light most favorable to her, Dunn states that the worst conduct of Stutts was when he touched her leg <u>one time</u>. The conduct as described by Dunn, with the exception of the one time he touched her leg, appears to be all verbal in nature. By definition, any reasonable person would consider it "relatively innocuous." The conduct was also infrequent, consisting of only a few incidences over a four-year time period that occurred usually only once or twice a month, again, most of the conduct being verbal in nature. Obviously, as a non-employee, Stutts was not in a position of authority over Dunn. Additionally, there is no evidence anyone other than Dunn was allegedly involved in the harassment.

Stutts' conduct as outlined above would not subject Dunn to intimidation, ridicule or insult and was obviously not severe or pervasive enough to alter the conditions or terms of Dunn's employment. This is especially true since Dunn testified that she was able to complete any and all of her work regardless of Stutts' conduct. Most importantly, all of the alleged misconduct of Stutts took place in a public courtroom in the presence of a circuit court criminal judge, court personnel and other individuals. It is not objectively or subjectively reasonable for Dunn to have perceived any of the alleged conduct of Stutts as harassment under the circumstances.

*Defendants' Brief*, pp. 24-26.

The plaintiff is precluded from raising any claim of sexual discrimination, sexual harassment, or sexually hostile environment because they were not raised in the plaintiff's EEOC complaint. Moreover, if such claims were not precluded, they would fail on their merits as a matter of law.

### Hendrix's Alleged Racial Remarks

In her brief, the plaintiff sets out certain remarks made by Hendrix she wants the court to consider. Hendrix said that he was sick and tired of talk about being disrespected, that "y'all" will kill someone for such conduct, that it was all "bullshit," and the plaintiff was overly aggressive and would not go very far in this field. *Plaintiff's Memorandum*, pp. 4-5. The plaintiff testified:

> Q. In your complaint, you allege that you had complained to Mr. Hendrix about the probation officer's offensive behavior and that he told you, "I"m sick and tired of you people saying that you have been disrespected. You kill people over being diss." And you spell dissed in your complaint, D-I-S-S-E-D. When did that conversation take place?
> A. After I have been written up.
> Q. Written up for what?
> A. Not calling Linda O'Bryant back.
> Q. What did you say in that conversation, and what did he say?
> A. I told him why I did not call Linda back. That it was not - - it wasn't because I did not want to give the information or - - but I had complained of how she had treated me; the way that she had spoken to me. And I felt I had been discriminated against; that I felt I had been disrespected. I felt that I had been disrespected and that this was why I did not call her back.
> Q. What else did he say to you in the meeting?
> A. After that he responded to me that he, "was sick and tired of y'all talking

> about being disrespected; that y'all will kill somebody just because they diss you."
>
> Q. And what did you say?
> A. I told him that that wasn't true; that if people wouldn't disrespect us, then we wouldn't complain so much; that may be it wouldn't be a problem of us feeling that we needed to - - that we wasn't disrespected, and something in that line.
> Q. When you say "us," who do you mean?
> A. Well, he said, "y'all" and that was referring to blacks. And I mean "us" as referring to blacks.
> Q. Okay. Tell me the rest of the conversation, what you said and what he said.
> A. I told him that I felt that the write up had happened because I was outspoken.
> Q. And?
> A. And because of the fact that I was not submissive to Linda.
> Q. Okay.
> A. And he told me he felt that was bullshit and he told me I was overly aggressive or something like that and I wouldn't make it far in this field. And I can't remember all the details. But I do remember the fact that it was to the point that he didn't feel that I was not being outspoken, but just the fact that I did not call her back.

*Dunn Deposition*, pp. 149-51. According to the plaintiff, Hendrix's "point" was that the plaintiff should have returned O'Bryant's phone call after Williams told her to. The plaintiff, therefore, did not think that Hendrix's statements were meant to be racially inflammatory. (The plaintiff and Hendrix socialized outside of the office.)

The plaintiff also points out that in July of 1996 she was told that Hendrix stated that "all black people eat goat." *Plaintiff's Memorandum*, pg. 6. On another occasion, she heard Hendrix tell Gardner, a black employee at TASC, that "[y]ou know all TASC clients are going to be black anyway." *Id.* at 6. The plaintiff does not remember the year, but she states that she walked into Hendrix's office as he stated, "I'm trying to help all the little

niggers." *Id.* at 7. Going back to 1993, the plaintiff states that in her presence Hendrix referred to a black male as "boy." *Id.* at 6. The plaintiff stated her *feelings*: "I was already feeling the tone changing and I felt it was because I had been complaining to [Hendrix] about being racially discriminated against. . ." *Id.* at 7.[3]

The plaintiff relies on *Walker v. Ford Motor Company*, 684 F.2d 1355 (11th Cir. 1982). Following a bench trial, the district judge held that the use of racial slurs at a car dealership was pervasive and constituted an unlawful practice under 42 U.S.C. §2000e-2(a)(1). The Eleventh Circuit set out the facts:

> Appellant Walker is a black man who in 1975 entered a minority dealer training program instituted by Ford and administered through participating local dealerships. During the 18-month training program trainees received a stipend of $1500 per month. Walker was assigned for his training to the Northgate Lincoln-Mercury dealership in Tampa, Florida. He began the program on October 27, 1975, and over the course of the next few months complained to Ford that Northgate management and employees repeatedly used offensive racial epithets, including referring to poorly repaired cars as "nigger-rigged" and referring to the salesman with the lowest sales volume as "the black ass." On one occasion the Northgate leasing manager called Walker a "dumb nigger";[FN1] another time, this same employee stated that one of the lease cars had been damaged by "niggers." On still another occasion, when a black man created a disturbance at the dealership, a salesman was instructed to call the police to "get this nigger out of here."

*Id.* at 1356. The court affirmed, stating that "the district court specifically found that Northgate personnel's use of the terms 'nigger-rigged' and 'black-ass,' as well as other racially abusive language was 'repeated,' 'continuous,' and 'prolonged' despite Walker's

---

[3] The court discusses Hendrix's statements in its discussion of the plaintiff's retaliation claims, *infra*.

objections, and that the language made Walker feel unwanted and uncomfortable in his surroundings." *Id.* at 1359.

It is not known what "all black people eat goat" means. Hendrix's statement that the plaintiff was too aggressive is not necessarily a racial statement. The statement that all TASC clients are going to be black is not necessarily a racial slur. Referring to a black man as "boy" would constitute a racial slur if comparable white men were not referred to as "boy." That remark, however, occurred in 1993, several years earlier. Wanting to help the young people who go through the program is commendable, though referring to them as "little niggers" is not, even if the term was uttered without malice. The plaintiff's "*feeling*," which primarily is what the plaintiff bases her claims on, that there was racial discrimination is a mere conclusion which must be supported by evidence.

The defendants move to strike Hendrix's statements on one or more of the following grounds: hearsay, remote in time, not being directed at the plaintiff, or never having been complained of. Any statement which the plaintiff said she heard from another person is inadmissible hearsay. The rest of Hendrix's statements may be considered, although the circumstances surrounding them are to be taken into account, such as how long ago they were spoken. Wherefore, the motion to strike is due to be granted in part --- the hearsay statements should be stricken --- and denied in part --- the other statements should not be stricken. The court further states, however, that, even considering *all* of Hendrix's statements which the plaintiff has pointed out, the evidence simply is

insufficient, as a matter of law, to support a finding that this plaintiff was subjected to a racially charged or racially hostile work environment.

### Retaliation

In the plaintiff's discussion of retaliation in her memorandum, she simply states that "the evidence shows the plaintiff began receiving frivolous reprimands after she made complaints of discrimination. The plaintiff was ultimately forced to resign in July, 1997." *Plaintiff's Memorandum*, pp. 22-23.

*Plaintiff's first probationary discipline*: The evidence shows that on December 11, 1995, Hendrix put Dunn on probation for forty-five days because of her substandard work performance. The disciplinary memorandum stated:

> This is to inform you of my decision to place you on probation for a period of 45 days (December 11, 1995 until January 24, 1996) due to your substandard work performance. A file check on November 30th indicated gross mismanagement of your caseload. Prior notification was given to all staff concerning this review and you did not respond adequately in preparing your documentation. Furthermore, I have given repeated warnings concerning monthly report deadlines and you have also neglected this critical task. Due to this pervasive lack of compliance, I will require the following steps be taken to remedy the situation:
>
> 1) All assessment decisions will be reviewed on a daily basis.
> 2) You will report for work promptly at the assigned time (8:30 a.m.); absolutely no tardiness will be tolerated.
> 3) Any sick time must be documented by a physician.
> 4) All client documentation must be accurate and complete in a timely fashion.
>
> I strongly encourage you to address any personal problems that are impacting

> your work performance.
>
> I will review your progress during your probationary period. Further non-compliance during this time or subsequent to your probation can result in further disciplinary action up to and including termination of employment.
>
> I am confident you will respond positively to these requirements. You are an accomplished case manager and a valuable employee.
>
> Please review these points and sign your agreement. If you have any questions, please see me.

*Dunn's Deposition,* Defendants' Exhibit 12. This probationary action was not transmitted to the Human Resource Management Department because Hendrix hoped the plaintiff's behavior would improve and he did not want this disciplinary to be a "permanent strike against [the plaintiff] if her behavior improved." *Hendrix Deposition,* pg. 27.

There is a signature of the plaintiff's name on this disciplinary memorandum. Although the plaintiff testified at her deposition that she had no memory of this disciplinary act, she also stated that the signature appeared to be hers.

*Plaintiff's second probationary disciplinary*: On March 14, 1996, Hendrix again placed the plaintiff on administrative probation. In his memorandum to the plaintiff he stated that he took the action in an attempt to "focus [her] attention to [her] duties at UAB-TASC," telling her that she was "a valuable member of the staff and [he] expect[ed] a positive response to [the] reprimand." *Dunn Deposition, Exhibit 13.* Hendrix testified that he put the plaintiff on probation because her files were in disarray, there was missing information, she failed to follow procedure concerning retrieving information, she failed

-13-

to see clients, and she failed to file her reports promptly. This time the disciplinary was made official and UAB's Human Resource Management Department was notified. Again the plaintiff states that she did not remember being placed on probation, but admitted that the memorandum appeared to bear her initials at the top.

*Plaintiff's third disciplinary*: On two different occasions in May, 1997, Williams told the plaintiff to contact O'Bryant, who had attempted to get in touch with the plaintiff concerning a client. Williams testified that the plaintiff was her friend and she did not want to have to discipline her for insubordination, and that the plaintiff was putting her in a "really bad spot." Williams was so upset over having to discipline the plaintiff that she cried. The plaintiff testified: "I told [Williams] that I felt the reason why all this was happening was because I had been complaining and I felt that I was racially discriminated against, and therefore, I did not sign it. . ." *Plaintiff's Memorandum*, pg. 4. In her deposition, however, the plaintiff admitted that she did not call O'Bryant back until after receiving a disciplinary notice. Additionally, the plaintiff stated in her conversation with Hendrix, *supra*, that Williams disciplined her because she was overly aggressive and unsubmissive. (Apparently, the plaintiff was not put on another probation at this time.)

*Plaintiff's third probationary disciplinary*: On June 19, 1997, Williams wrote a disciplinary memorandum to the plaintiff concerning her substandard job performance. The memorandum stated that Dunn had stored numerous assessment files in her office

-14-

and they were late by weeks. Also, Dunn had done only twenty assessments for the entire month of May, while the other assessment team members had done twice that amount. The memorandum also informed the plaintiff that while she was on probation, any absences or tardiness for any reason would not be tolerated. Although the plaintiff testified that she disagreed with the statements in this memorandum, she never complained about it, just as she never complained about any of the write-ups she received from Williams or Hendrix.

*Williams' conversation concerning plaintiff to prospective employer*: The plaintiff states that on July 8, 1997, Williams and Hendrix set up a meeting with her. The plaintiff testified to her conversation with Williams on that occasion:

> [Williams said] maybe you need to look for another job before she would have to give me a bad reference. I asked her about the bad reference. I remember her looking at Ralph and then back and me [sic] and said, "yeah, I can give you a bad reference." So I told her, "Thank you," and I got up and left.

*Plaintiff's Memorandum*, pg. 10: Plaintiff's Deposition, pg. 225.[4]

The plaintiff resigned. The next day she talked to Chris Rossi, a Human Resource Management personnel representative at UAB. He told the plaintiff that UAB policy forbid disclosing any information about former employees other than the hiring date, termination date, and position held. The plaintiff was present when Rossi left a message on Williams' voice mail, apparently telling Williams not to give any other information

---

[4] The plaintiff was looking for another position before it was suggested that she consider resigning.

about the plaintiff. Rossi told the plaintiff he "would get back in contact with [her] and let [her] know, [but she] told him [she] was going to go ahead and resign because [she] felt they were going to fire [her] and [she] didn't want a bad reference." *Plaintiff's Memorandum*, pg. 12; *Plaintiff's Deposition*, pg. 12. The plaintiff claims that a representative of TRI, where the plaintiff was applying for a job, called Williams, and Williams, in violation of UAB policy, gave the plaintiff a bad reference over the telephone which cost the plaintiff a job with TRI. The plaintiff claims that Williams gave her a bad reference in retaliation for the plaintiff's having complained about the probation officers.

More, however, is involved. UAB policy allows providing additional information if the former employee's prospective position would involve a close affiliation or relationship with UAB. TRI is such an entity, as it is closely affiliated with the granting agency that funds TASC. In fact, Rossi testified that if he had known of the close relationship between TASC and TRI he would have told the plaintiff that it was proper to release information concerning the plaintiff's prior performance. The TRI representative who called Williams, a Ms. Harrell, testified that it would have been inappropriate and unfair to TASC employees to expect them to work with an employee with whom they had a prior unsatisfactory relationship. Harrell also testified that the only thing Williams told her about the plaintiff was that she not left TASC under favorable circumstances. Harrell also stated that Williams was reluctant to give even that

much information. The plaintiff had already told TRI that she was having problems at TASC, and she told Harrell of her specific problems with Stutts and O'Bryant.[5]

*The plaintiff's divorce*: The plaintiff filed for a divorce in July of 1994. A divorce was granted in 1995 or 1996. The plaintiff later sought the services of a psychologist. In a new-patient form, dated February 11, 1997, she wrote that the problems she was experiencing were due to her divorce and job. She also stated that the problems had been ongoing for two years. The plaintiff submitted her resignation on July 8, 1997 to become effective August 8, 1997.

According to her psychiatric records, the plaintiff admitted that her work performance was inadequate and that her work supervisor was not treating her unfairly:

> Patient's major struggle in her present job is with her immediate supervisor. Apparently she transferred to this position and performed quite well for her first three years or so and was by her description favored by her supervisor. Apparently they had a very close and supportive relationship. However, as patient's work began to falter secondary to her turmoil in her marriage, apparently her supervisor backed away from her and at the present time she feels he is withholding his personal support although she describes no unfairness of his handling of her. Patient does admit that she left much work undone and in general her work performance was substandard.

*Declaration of Dr. Herman Willcutt, PHD*, Defendant's Exhibit F. The psychologist found that there was "evidence of immaturity in [the plaintiff's] judgment with likely dependence which probably contributed to her choice of marriage partners as well as to

---

[5] The defendants state that if the plaintiff is making a constructive discharge claim, it is without merit. The court agrees.

her struggle with supervisor. Patient is interested in psychotherapy. . . ."

These evidentiary records support the reasons Hendrix and Williams gave for having taken disciplinary action against the plaintiff, *infra*. It is also noted that both Hendrix and Williams had been close friends with the plaintiff outside the workplace.

*Hendrix's statements*: The plaintiff might be contending that she was retaliated against because of her conversation with Hendrix, *supra* (in which Hendrix allegedly made racially hostile statements). That conversation took place *after* the plaintiff had been "written-up" twice by Hendrix and once by Williams, and, therefore, those disciplinary actions could not have been taken in retaliation for the plaintiff's telling Hendrix that O'Bryant had discriminated against her.

*Discussion*: A plaintiff may establish a prima facie case of retaliation by showing that she engaged in a statutorily protected activity, her employer took an adverse employment action against her, and there is a causal connection between the protected activity and the adverse action. A plaintiff may satisfy the causal connection requirement by producing evidence showing that the protected activity and the negative employment actions are not completely unrelated. *Coutu v. Martin County Board of Commissioners*, 47 F.3d 1068 (11th Cir. 1995). Additionally, a plaintiff must actually believe that her employer was engaged in an unlawful employment practice, and that that belief, though it may be mistaken, must be objectively reasonable as well. *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997). If a plaintiff makes out a prima facie case of

retaliation, the employer must come forward with a nonretaliatory reason for the employment action complained of. If the employer does so, it is incumbent upon the plaintiff to point to evidence establishing a factual issue as to whether the reason given by the employer is a mere pretext for the action in question. *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993).

The plaintiff's belief that she was the victim of discrimination or harassment or was forced to work in a sexually or racially hostile environment was not objectively reasonable. Moreover, the defendants have come forward with legitimate, non-retaliatory reasons for every claim of retaliation made by the plaintiff, and the plaintiff has not come forward with evidence of pretext as to any such reason.

### Section 1983 Claims Against Hendrix and Williams

The defendants state that the exclusive remedy for a retaliation claim is Title VII, as retaliation is a statutory, not a constitutional cause of action. The defendants also assert that they cannot be sued in their official capacities because that would be tantamount to suing the State of Alabama, which enjoys sovereign immunity. As to suing them in their personal capacities, Hendrix and Williams assert qualified immunity. The defendants also state that the plaintiff failed to comply with UAB's Equal Opportunity Policy, which states that complaints of race or sex discrimination should be made to three persons, and neither Hendrix nor Williams was one of the three. With respect to sexual harassment

complaints in particular, UAB policy provides that a complainant should go to the office of personnel administration or her *supervisor*; however, the defendants assert that it is clearly unreasonable to consider an employee as having complied with the policy's reporting requirement when she complains to the person about whom she is complaining.

All of these contentions appear to be well-founded. The defendants' first contention, however, is sufficient: because the facts do not support any kind of discrimination, harassment, hostile environment, or retaliation claim, it follows that the plaintiff cannot maintain a § 1983 claim against Hendrix or Williams.

## Conclusion

The defendants' motion for summary judgment is due to be granted in toto and all claims dismissed. An order in accordance with this memorandum of opinion will be entered.

DONE this 19th day of March, 2002.

_____
William M. Acker, Jr.
United States District Judge